Commonwealth vs. Frederick Christian.

Plymouth. September 8, 1999. - January 14, 2000.

Present: Marshall, C.J., Abrams, Lynch, Greaney, & Ireland, JJ.

*Practice, Criminal,* Required finding, Instructions to jury, Lesser included offense, Cross-examination by prosecutor, Argument by prosecutor, Capital case. *Robbery. Joint Enterprise. Homicide. Felony-Murder Rule. Larceny.*

At the trial of two indictments for murder in the first degree on a theory of felony-murder with armed robbery as the underlying felony, the Commonwealth produced more than sufficient evidence from which a rational jury could conclude beyond a reasonable doubt that the defendant, as a joint venturer, committed an armed robbery [554-556]; and the armed robbery was, in any circumstance, sufficiently independent of the murder to support a conviction of felony-murder [556-557].

At the trial of indictments for felony-murder in the first degree with armed robbery as the underlying felony, the judge properly instructed on murder in the second degree, and there was no basis in the evidence, in the circumstances, for an instruction to the jury, as requested by the defendant, on felony-murder in the second degree with larceny as the underlying felony. [557-559]

At a murder trial, the judge erred in allowing the prosecutor improperly to cross-examine the defendant concerning incriminating statements he allegedly made to an inmate while in jail, for which no foundation had been laid or proffered and through which the prosecutor sought to establish that the defendant was guilty of premeditated murder; however, the error was not prejudicial in light of the entire trial record and the jury's verdict of guilty on the alternative theory of felony-murder. [559-564]

At a murder trial, references in the prosecutor's closing argument to facts allegedly not in evidence were permissible inferences drawn from the evidence; further, any possible harm was avoided by the judge's immediate curative instructions to the jury. [564-565]

At a murder trial, the prosecutor in closing argument properly responded to arguments made by defense counsel in his closing, and the prosecutor's passing references to the defendant's having adapted his testimony to conform to that of other witnesses did not rise to the level of error resulting in a substantial likelihood of a miscarriage of justice. [565-566]

At a murder trial, the judge's instructions to the jury, viewed as a whole, sufficiently conveyed the correct concept of assistance required to establish a joint venture. [566-567]

Indictments found and returned in the Superior Court Department on August 30, 1994.

The cases were tried before *Charles J. Hely*, J.

*Ruth Greenberg* for the defendant.

*Gail M. McKenna*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant, Frederick Christian, was convicted on two indictments charging murder in the first degree on a theory of felony-murder, G. L. c. 265, § 1.[1] The jury found that he was a joint venturer with another individual, Russell Horton, in an armed robbery that served as the predicate felony for his murder convictions. The jury also convicted the defendant of assault. The judge had allowed, in part, a motion for a required finding of not guilty on the indictment charging assault with intent to murder, and reduced the charge to assault. The defendant was sentenced to two concurrent terms of life in prison on the murder convictions and a concurrent term of two and one-half years on the assault conviction.

On appeal, the defendant claims that the evidence against him was insufficient to prove armed robbery and that he should not have been convicted of felony-murder in the first degree. He further claims that the predicate felony of armed robbery cannot support his convictions of murder in this case because of the doctrine of merger. The defendant challenges several of the jury instructions and the prosecutor's conduct both during cross-examination of the defendant and closing argument. We affirm the defendant's convictions, and see no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or reduce the murder verdicts.

1. *Facts.* The evidence is recited in its aspect most favorable to the Commonwealth. At approximately 10 P.M. on May 25, 1994, Carlos Araujo (Carlos), his brother, Manuel Araujo (Manny), and Kepler Desir were each shot in the head by Horton. Manny and Desir died immediately from single gunshot wounds. Carlos survived.

Earlier that day another individual, Henry Garcia, was at the defendant's apartment in Brockton. Garcia told the defendant that he and Desir planned to go to New York City that evening to restock their supply of narcotics, and that Desir planned to buy more than two ounces of cocaine. Cocaine in that amount would cost over $1,500. The defendant was also interested in

---

[1] The judge charged the jury on the theories of both deliberate premeditated murder and felony-murder.

purchasing narcotics in New York, but could not afford to do so. Garcia testified that he paged Desir for the defendant, who then asked Desir to lend him some drugs to sell, but Desir refused to do so. After Garcia left the defendant's apartment, Horton arrived. A roommate testified that Horton used the telephone, and Horton and the defendant then left the apartment. As they left, the defendant took his gun from beneath a couch.

In the meantime, Desir had joined Manny and Carlos. Around 8 P.M. that same evening, those three picked up the defendant and Horton by car. While in the car, Desir and Horton discussed a plan to rob some local drug dealers. On Horton's instructions, Manny drove the car to the drug dealers' house, where Horton and the defendant got out of the car. They were gone for about five minutes, returned to the car, and informed the others they would return later to carry out the robbery. Back in the car Horton sat behind the driver, Manny. The defendant sat in the middle. Carlos was seated behind Desir on the passenger side of the car. At Horton's direction, Manny drove the car to a parking lot near a school building where he stopped the car and they all waited.

Without warning, Horton opened fire on Carlos, Manny, and Desir. He shot each in the head with single shots. Carlos was the only survivor. While feigning death, Carlos heard either the defendant or Horton say, "Turn off the lights," and other snippets of conversation discussed below. The defendant and Horton then left the car. Carlos dragged himself out of the car and obtained help. When the police arrived they found Manny and Desir dead. Desir's shirt had been pulled up, suggesting that his pockets had been searched. The police found little more than one dollar in his pockets.

The defendant and Horton fled to Barry Stephens's apartment nearby. Horton told Stephens in the defendant's presence that he had killed three men and asked Stephens to hide a gun. Stephens refused. As the defendant and Horton left, the defendant turned to Stephens and told him to "keep it under your hat." The defendant made efforts to evade arrest, but the police took him into custody the next day. He gave several contradictory statements to the police, at first denying any knowledge of the killings, a statement he later disavowed.

2. *Required finding of not guilty.* The defendant argues that the evidence at trial was insufficient to prove armed robbery, the

predicate felony of his convictions of felony-murder in the first degree. Rather, he contends, the evidence supported only an inference that his intent to steal occurred, if at all, subsequent to the killings, and that the evidence was insufficient to show he shared any intent with Horton to commit any act or that he knew Desir was carrying any money.

In reviewing the denial of a motion for a required finding of not guilty we consider whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979). Although it may be arguable in a particular case that other inferences could be drawn from some of the evidence, our calculus does not include the fact "that some of the evidence could be characterized as equivocal or contradictory." *Commonwealth* v. *James*, 424 Mass. 770, 785 (1997), quoting *Commonwealth* v. *Ruci*, 409 Mass. 94, 97 (1991). Using this standard, the Commonwealth offered more than sufficient evidence from which a rational jury could have found beyond a reasonable doubt that the defendant, as a joint venturer, committed an armed robbery.

Garcia testified that the defendant knew Desir was going to New York that evening to purchase cocaine for which he would be carrying a significant amount of money. That evening the defendant took his gun as he went with Horton to meet Desir and the Araujo brothers. Immediately after the shootings, Carlos heard the defendant ask Horton, "Did you do him?," and Horton replied, "go through his pockets," after which Carlos felt the defendant moving about the car. Desir's shirt had been pulled up raising an inference that the defendant had searched Desir's pockets. Perhaps as significant is what Carlos did not recall hearing after the shooting: the defendant did not express surprise or consternation, he did not plead for his own life, and he did not attempt to escape. Horton did not shoot the defendant, suggesting that the defendant was part of the plan to rob Desir. After the killings both men went to the home of Stephens where the defendant told Stephens to keep the killings "under [his] hat." Based on this evidence the jury could have found, beyond a reasonable doubt, that the defendant acted in concert with Horton to carry out their prearranged plan to rob Desir of his money. The judge did not err in denying those portions of the

motion for a required finding of not guilty that the defendant now challenges.

3. *Felony-murder merger doctrine.* The defendant argues that he is entitled to a directed verdict of acquittal because of the merger doctrine governing convictions of felony-murder. An armed robbery by force, as opposed to threat of force, he claims, is not sufficiently independent of the murder to constitute a separate offense, particularly where, as here, a defendant shoots a victim before taking his property. The defendant misapprehends the doctrine.

We can envision no situation in which an armed robbery would not support a conviction of felony-murder. See *Commonwealth* v. *Currie,* 388 Mass. 776, 785 (1983). The crime of robbery is the (1) stealing or taking of personal property of another (2) by force and violence, or by assault and putting in fear. G. L. c. 265, § 19.[2] Robbery is enhanced to an armed robbery when a defendant is armed. G. L. c. 265, § 17. It is the first element of the crimes of robbery and armed robbery, namely the stealing or taking of property, that qualifies them for application of the felony-murder rule. It is the intent to do that conduct (here stealing from Desir) that serves as the substitute for the malice requirement of murder.[3] Where a defendant commits the felony of larceny, that crime could not serve as the predicate felony for felony-murder in the first degree, for larceny is not punishable by life imprisonment. The element that enhances larceny to a felony punishable by life in prison, namely the second element of robbery, by force and violence, or by assault and putting in fear, does not negate the intent to steal or take property that is the substitute for the malice requirement of murder. Cf. *Commonwealth* v. *Wade,* 428 Mass. 147, 153 (1998) ("element that provides for the enhancement of the crime of rape to a felony punishable by life in prison [kidnap-

---

[2]General Laws c. 265, § 19 (*b*), states:

"Whoever, not being armed with a dangerous weapon, by force and violence, or by assault and putting in fear, robs, steals or takes from the person of another, or from his immediate control, money or other property which may be the subject of larceny, shall be punished by imprisonment in the state prison for life or for any term of years."

[3]It is irrelevant that there was an assault on three victims, resulting in the death of two. Had only Desir been assaulted and killed, the analysis would be no different.

ping, or infliction of serious bodily injury], does not negate the intent to commit the rape that is the substitute for the malice requirement of murder"). The manner in which a robber accomplishes the taking of property does not inform the merger analysis, and a defendant who commits a robbery in a manner that intentionally heightens the possibility of the victim's death, by shooting the victim first, cannot escape application of the felony-murder rule. As a matter of logic and policy, those who inflict bodily injury on their victims before they complete their crimes are not treated more leniently than those who do not.

4. *Instruction on larceny.* The defendant asked the judge to instruct the jury on larceny as the predicate offense to the felony-murder charges. He challenges the judge's refusal to do so, arguing that this precluded the jury from returning guilty verdicts of felony-murder in the second degree.

A jury should be instructed on any lesser included offense of the crime charged if "the evidence provides a rational basis for acquitting the defendant of the crime charged and convicting him of the lesser included offense." *Commonwealth* v. *Santo,* 375 Mass. 299, 305 (1978). We have treated the request for a larceny instruction in a felony-murder conviction predicated on robbery as a request for an instruction on a lesser included offense. See *Commonwealth* v. *Glowacki,* 398 Mass. 507, 513-515 (1986). The application of the standard of "lesser included offense" of the "crime charged" is not, strictly speaking, correct in this context because robbery is not the charged offense, but merely the predicate to the charged offense of murder in the first degree. A request for an instruction on larceny, therefore, is not a request for an instruction on a "lesser included offense" of the "crime charged," but a request for an instruction on a lesser degree of murder, felony-murder in the second degree.[4]

A judge, of course, is required to give an instruction on the degrees of murder when the defendant is charged with murder in the first degree. See *Commonwealth* v. *Vinnie,* 428 Mass. 161, 179-180, cert. denied, 525 U.S. 1007 (1998); *Commonwealth* v. *Brown,* 392 Mass. 632, 645 (1984) (held that

---

[4]We have said in the context of sentencing on a conviction of felony-murder that the predicate felony is a "lesser included offense," such that a "conviction for that felony, in addition to the conviction of murder, is duplicative." *Commonwealth* v. *Gunter,* 427 Mass. 259, 276 (1998). See *Commonwealth* v. *Mello,* 420 Mass. 375, 398 (1995). The concept of "lesser included offense" in the context of instructions to the jury is different.

G. L. c. 265, § 1, "requires a trial judge to instruct on murder in the first and second degrees if there is evidence of murder in the first degree, even though there appears to be no hypothesis in the evidence to support a verdict of murder in the second degree"); *Commonwealth* v. *Dickerson*, 372 Mass. 783, 795-798 (1977). Here the judge did instruct the jury on murder in the second degree when he defined malice. That instruction was sufficient in the context of this case. Our holdings in the *Vinnie, Brown,* and *Dickerson* cases do not require (or imply) that a judge must give, as well, an instruction on felony-murder in the second degree when the defendant is charged with felony-murder in the first degree. An instruction on felony-murder in the second degree is required only when there is a rational basis in the evidence to warrant the instruction.

In determining whether such an instruction is warranted in a particular case, a judge looks to all of the elements of that crime. See, e.g., *Commonwealth* v. *Cruz, ante* 182, 185 (1999) (felony-murder in second degree instruction not required because underlying felony could not support verdict on all elements of felony-murder, namely that felony was committed with conscious disregard for risk to human life and death of victim was not natural or probable consequence of felony). A conviction of felony-murder in the second degree requires the jury to find that (1) the defendant committed or attempted to commit a felony with a maximum sentence of less than imprisonment for life, (2) a killing occurred during the commission or attempted commission of that felony, and (3) the felony was inherently dangerous or the defendant acted with conscious disregard for the risk to human life. See *Commonwealth* v. *Ortiz*, 408 Mass. 463, 465-467 (1990), and cases cited.

The felony of larceny is the unlawful stealing of the personal property of another with the intent to deprive the person of the property permanently. G. L. c. 266, § 30; *Commonwealth* v. *Sollivan*, 40 Mass. App. Ct. 284, 287 (1996). To return a verdict of larceny, not robbery, a jury must conclude that any property was taken without the threat or use of force. The defendant argues that in this case there was no threat or use of force because the killings occurred first, and that he developed an intent, if any, to remove property from the victims' bodies only after the fatal shots were fired. See *Commonwealth* v. *Johnson*,

379 Mass. 177, 182 (1979) (larceny instruction not warranted where no evidence offered that killing occurred first and then defendant decided to remove money from victim's body). His argument rests on an interpretation of the facts not supported by the record. There was no evidence, nor any rational inference based on the evidence, that the defendant formed an intent to remove the property for the first time after the fatal shots were fired.[5] On the other hand, there was ample evidence from which the jury could infer that the defendant and Horton planned to rob Desir before the killing occurred.

Even if the evidence conceivably (if wholly unlikely) supported a.charge of larceny, the defendant's argument nevertheless fails. Felony-murder in the second degree requires a finding that the homicide occur "in the commission or attempted commission" of a felonious crime. G. L. c. 265, § 1. For a killing to be committed "in the commission or attempted commission" of a felony some causal connection between the felony and the homicide must exist. See *Commonwealth* v. *Dickerson, supra* at 801. If, as the defendant contends, the larceny was committed as an afterthought to a homicide, there is no causal relationship to the deaths. See 2 W.R. LaFave & A.W. Scott, Jr., Substantive Criminal Law § 7.5(4) (1986) (noting homicide, done without thought of felony, cannot be "in the commission of" felony).

Because there was no rational evidentiary basis for a larceny instruction on the second element of felony-murder in the second degree, and the evidentiary basis for the first element was questionable at best, the judge correctly declined to give an instruction on felony-murder in the second degree based on larceny.

5. *Cross-examination of the defendant.* Just before trial commenced the Commonwealth informed the defendant of its intention to call Mark Obershaw, formerly a jail inmate with the defendant, to testify concerning incriminating statements allegedly made by the defendant to Obershaw in jail. But the prosecutor later decided not to call Obershaw, either during the Commonwealth's case-in-chief or during rebuttal. The defendant testified, but said nothing about any conversations with Obershaw. Over the defendant's objections, the judge nevertheless

---

[5]Horton's statement to the defendant to "go through his pockets" does not support — by inference or otherwise — a finding of what moment in time the defendant formed the intent to rob Desir.

allowed the prosecutor to cross-examine the defendant at some length about specific aspects of conversations he allegedly had with Obershaw.[6] She put before the jury the incriminating state-

---

[6]We recount here only some of the questions:

Q.:    "Did you tell [Obershaw] that you went out to smoke somebody, you and [the accomplice], that night?"

A.:    "No, ma'am. I did not."

Q.:    "Didn't you brag about the fact that this happened in a car, and that you were going to get away with this because the victim wasn't going to testify?"

       ". . .

A.:    "No."

       ". . .

Q.:    "You also told Mark Obershaw that this incident was for personal reasons. Isn't that right?"

A.:    "No, ma'am."

Q.:    "Did you tell — excuse me. You also told Mark Obershaw that, as you sat there in the car that night, you kept saying to yourself, 'When's he going to do it? When's he going to do it? When's he going to do it?' Isn't that right?"

       ". . .

A.:    "No, ma'am. I never told him anything like that."

Q.:    "And it seemed like an eternity sitting in that car before he fired those three shots. Isn't that right, sir?"

A.:    "No, ma'am. I never said that."

       ". . .

Q.:    "Did you also tell Mark Obershaw that the police didn't find the gun because it was buried good?"

A.:    "No, ma'am. I never said that."

Q.:    "Didn't you tell him also that they didn't find your clothing, because you hid it in the spare room at Inez Pinto's apartment?"

A.:    "No, ma'am. I did not."

ments by the defendant,[7] each one of which the defendant denied. It was error for the judge to permit the prosecutor to cross-examine the defendant in this manner.

A prosecutor may not conduct cross-examination "in bad faith or without foundation." *Commonwealth* v. *White*, 367 Mass. 280, 285 (1975). In that case, we quoted with approval from the ABA Standards Relating to the Prosecution Function § 5.7(d), at 284 (Approved Draft 1971), which states: "The attempt to communicate impressions by innuendo through questions which are answered in the negative, for example . . . 'Did you tell Mr. X that . . . ?' when the questioner has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts." The Commonwealth argues that the questions concerning Obershaw were permissible because the prosecutor had a good faith basis for asking the questions: it claims here that the prosecutor was relying on a letter that Obershaw allegedly had written to the prosecutor before the trial. (The letter was not marked for identification, was not shown to the judge, and is not contained in the record.) A cross-examiner may ask a question that implies the truth of a proposition if she has a basis in fact for asking the question and is prepared to disclose that reason to the judge. See *Commonwealth* v. *White, supra.* See also *Commonwealth* v. *La-Faille, ante* 44, 54 (1999); P.J. Liacos, Massachusetts Evidence § 3.2, at 52 (7th ed. 1999) ("It is improper for the cross-examiner to ask a question that implies the truth of a proposition he knows to be false; the cross-examiner should have a basis in fact for asking any such question and must be prepared to disclose that reason to the judge").

Two problems, independent but related, arise from the prosecutor's tactics in this case.[8] First, while she did not call

---

[7]The Commonwealth was represented by two assistant district attorneys, one male and one female. The latter cross-examined the defendant.

[8]The decision not to call Obershaw appears to have been tactical, for the Commonwealth makes no claim that Obershaw was unavailable. The Commonwealth argues here that it sought to "reopen the evidence" so that Obershaw's testimony could be heard by the jury. That claim is misleading: it did so only when the evidence had concluded, and in response to a suggestion by the judge that he might not instruct the jury on the theory of deliberate premeditation. See note 1, *supra*. The Commonwealth's belated attempt to call Obershaw had nothing to do with the adequacy of the basis for the prosecutor's questions.

Obershaw during the Commonwealth's case-in-chief, the prosecutor informed the judge that she "anticipated" calling Obershaw if the defendant testified. Perhaps for that reason the judge appears not to have thought it necessary to test the basis of the prosecutor's "good faith" in cross-examining the defendant about his alleged statements to Obershaw. When the prosecutor began the questions, defense counsel immediately objected and was overruled. At that point the judge did not ask the prosecutor to explain her basis for asking the questions, and the prosecutor did not disclose any to the judge. The prosecutor made no reference to the letter. We have no basis, therefore, to determine whether any implicit determination by the judge that the prosecutor did have a reasonable basis to proceed was correct.[9] See *Commonwealth* v. *Delrio*, 22 Mass. App. Ct. 712, 721 (1986) ("Where an examiner on cross-examination suggests new facts in an effort to impeach a witness, the examiner should be required to represent that he has a reasonable basis for the suggestion, and also to be prepared with proof if the witness does not acquiesce in the suggestion by giving a self-impeaching answer").

Even if we were to assume that the judge had concluded that the prosecutor's reliance on the Obershaw letter was reasonable and made in good faith, a conclusion that seems doubtful, the judge should have curtailed the questioning and should not have permitted the prosecutor to continue to cross-examine the defendant in the face of his consistent denials. It was permissible for the judge to permit the prosecutor to ask the defendant one question about his alleged conversation with Obershaw (see note 6, *supra*). When the defendant denied making the statement, the judge should either have curtailed any further questions, ordered the voir dire of Obershaw, or again sought assurance from the prosecutor that she would call Obershaw to

---

[9]There is reason to doubt whether the letter would have provided the requisite good faith basis for the prosecutor to proceed. Defense counsel earlier had informed the judge that Obershaw was involved in a scheme to fabricate information in other pending cases, presumably to obtain a favorable disposition of charges Obershaw would face for the killing of his brother. Defense counsel requested that the judge conduct a voir dire of Obershaw, and he sought an opportunity to retain an expert to challenge the handwriting of the letter. The judge deferred ruling on both requests until Obershaw was called, which never occurred.

testify.[10] To do otherwise would permit the prosecutor to smear the defendant by extrajudicial statements made by Obershaw while denying the defendant the opportunity to impeach Obershaw's credibility.

The issue remains whether the error prejudiced the defendant. The defendant argues the error is one of constitutional magnitude because the effect of the error was to shift to him the burden of proving that he had not made the incriminating statements, citing *Commonwealth* v. *Delrio, supra* at 721. We see no such shifting of the burden, nor does *Delrio, supra,* support that such an error implicates constitutional protection. Accordingly, we must determine whether "the error did not influence the jury, or had but very slight effect." *Commonwealth* v. *Flebotte,* 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi,* 15 Mass. App. Ct. 437, 445 (1983) (nonconstitutional error). Based on our review of the entire transcript and particularly in light of the jury verdict, we conclude that the error was nonprejudicial. The Commonwealth presented two theories of murder against the defendant: deliberate premeditated murder and felony-murder. The jury rejected the former and convicted only on the latter theory. Through her improper questions during her cross-examination of the defendant, the prosecutor sought to establish that the defendant was guilty of premeditated murder.[11] None of the questions concerned the defendant's joining with Horton to rob Desir, the predicate felony to the felony-murder charges. After the cross-examination, the judge gave careful limiting instructions to the jury, explicitly addressing the prosecutor's questions concerning Obershaw[12]; the limiting

---

[10]Had the Commonwealth called Obershaw as a witness, Obershaw's testimony, as an admission against the defendant, would have been admitted as substantive evidence, with the defendant having a full opportunity to confront Obershaw. The Commonwealth's tactic in deciding not to call Obershaw, but nevertheless seeking to put before the jury the out-of-court statements — presumably for impeachment purposes only — illuminates the potential for unfairness in the trial.

[11]See note 8, *supra.*

[12]The judge gave the following instruction:

"Attorneys' questions are not evidence. And it's common, and many times proper, and certainly permissible to ask questions that may — the question itself may allege certain facts. For example, an attorney might ask a witness, 'Did you tell Mr. Jones that you beat your wife?' If the witness denies it, and there's no other evidence on that point, then the

instructions followed closely on the prosecutor's questions[13]; and the jury plainly followed those instructions. They did not convict the defendant on the Commonwealth's theory of premeditated murder. In short, the prosecutor's improper questions were neutralized by the jury. Had the jury not acquitted the defendant of premeditated murder, we could not have concluded that the errors were not prejudicial to the defendant. Cf. *United States* v. *Sanchez*, 176 F.3d 1214, 1221-1222 (9th Cir. 1999) (reversing conviction because prosecutor cross-examined defendant with inadmissible statements made by defendant's spouse); *United States* v. *Hall*, 989 F.2d 711, 716-717 (4th Cir. 1993) (same).

6. *Prosecution's closing statements.* The prosecutor made several statements in his closing argument about which the defendant complains. With respect to each challenge, we consider the prosecutor's remarks in the context of his entire argument, the evidence at trial, and the judge's instructions to the jury. See *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992); *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990).

a. *Alleged reference to facts not in evidence.* Defense counsel objected at trial to the prosecutor's argument in closing that (1) the gun the defendant took from underneath his couch was the murder weapon and (2) the defendant knew that Desir was carrying money that night and had searched his pockets with the intent to steal the money. On appeal he renews his argument that the facts do not support any such inference. A lawyer, of course, is permitted to argue theories supported by the evidence

---

attorney's question is not to be considered in any way. It's simply not evidence in the case.

"We had some questions today, beginning with [the prosecutor], regarding conversations with Mr. Obershaw, who was not a witness in this case. The Defendant made the answers. Whatever his answers were is for the jury to consider as to what the evidence is. But if he denied certain things that were stated in the question, and there's no other evidence to support it, *you must completely disregard it.* It's not evidence in the case" (emphasis added).

[13]Following the prosecutor's cross-examination of him, the defendant called one witness who testified, briefly, to rebut the suggestion made through the prosecutor's improper questioning that the defendant had made the incriminating statements to Obershaw. The defense then rested, and the Commonwealth recalled one witness who testified, briefly, about a different issue.

and any fair inferences to be drawn therefrom. See *Commonwealth* v. *Paradise*, 405 Mass. 141, 152 (1989); *Commonwealth* v. *Kozec*, 399 Mass. 514, 516 (1987). Counsel should not, however, refer to facts not in evidence. *Id.*

These challenged references by the prosecutor are fair inferences drawn from the evidence. As to the first, there was evidence that the defendant had taken his gun with him when he and Horton went to join Desir. Carlos testified that, while in the car before the shootings, Horton displayed a gun and asked if anyone else in the car was carrying a gun. They all said no. There was expert testimony that ballistics analysis had determined that the murder weapon was consistent with the type of gun seen in the car. It was fair for the jury to infer, therefore, that the only gun in the car, the gun used in the killings, was the same gun the defendant had taken earlier from beneath his couch.

As to the second challenged statements, there was evidence that the defendant knew that Desir was carrying a significant sum of money on the night of the murder. In addition, following the shootings, Carlos felt the defendant move around the car after Horton said, "Go through his pockets." If the prosecutor's statement that it was the defendant (and not Horton) who had searched Desir stretched too far, the judge cured any possible harm by promptly interjecting:

> "As far as actual observations of somebody going through pockets, you'll recall that no one — no witness testified to seeing that. It's up to the jury to determine whether any reasonable inferences can be drawn from all the facts and circumstances."

In light of the evidence and the judge's instructions during the prosecutor's closing argument, we see no merit to these challenges.

b. *Alleged burden-shifting language.* The defendant argues for the first time on appeal that certain statements made by the prosecutor improperly shifted the burden of proof to the defendant by suggesting that the jury could only acquit if it believed the defendant's story. The prosecutor implied, on two occasions, that the defendant had adapted his testimony to conform to the testimony presented by other witnesses, which he, of course, had heard. The prosecutor on several other occa-

sions said that the defendant "wants you to believe" a certain version of the facts. See *Commonwealth* v. *Fruchtman*, 418 Mass. 8, 18-19, cert. denied, 513 U.S. 951 (1994). It is apparent from a review of the entire closing argument that these statements were made in response to defense counsel's closing argument. A prosecutor may do so to the extent necessary to correct any erroneous impression created by defense counsel. See *Commonwealth* v. *Kozec, supra* at 519 n.9.

Were we to give the defendant the benefit of every doubt and decide that there was an error, our review would be limited to whether any such error resulted in a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 354 (1998). The prosecutor's passing references to the defendant's testimony or the defendant's version of the facts do not rise to that level.

7. *Jury instructions on joint venture.* The defendant challenges the judge's instruction on joint venture. A proper instruction on joint venture in armed robbery requires a judge to inform the jury of three elements: (1) that the Commonwealth must prove beyond a reasonable doubt that the defendant intentionally assisted the joint venturer in committing the robbery; (2) that the defendant knew that the joint venturer was armed with a weapon during that time; and (3) that the defendant possessed the mental state required to commit an armed robbery. See Model Jury Instructions on Homicide 64 (1999); *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979). The defendant challenges the judge's instruction on the first element, relying on the following select portion of the judge's instruction:

> "The assistance element necessary for a joint venture to commit an armed robbery may be satisfied *by any type of assistance* given to the other person, as long as it was for the purpose of helping accomplish an armed robbery" (emphasis added).

But that is not all that the judge instructed. The judge continued at some length to explicate the issue of assistance by way of examples.[14] Read in isolation, the contested portion arguably could be viewed as inadequate because "any type" of assistance will not establish a joint venture. As the defendant suggests, ac-

---

[14]The judge instructed:

cessorial liability after the fact would not be enough to establish the assistance necessary for joint venture. However, we do not review jury instructions in isolation, but look to the charge in its entirety, in light of its over-all impact on the jury. See *Commonwealth* v. *Clarke*, 418 Mass. 207, 216 (1994). The judge's full instructions, including the repeated references to "the purpose of accomplishing an armed robbery," and the four examples of assistance in other contexts, sufficiently conveyed the correct concept of assistance required to establish a joint venture.

8. *General Laws c. 278, § 33E.* We have examined the other claims raised by the defendant, including those not pursued in his brief and those argued, improperly in some instances, in supplemental letters filed under Mass. R. A. P. 16 (1), as amended, 386 Mass. 1247 (1982).[15] We find no reason to

"Some examples of assistance that may be sufficient in a particular case include: if a defendant drove another man to a store, knowing that he was armed *for the purpose of helping him commit an armed robbery* of the store clerk, and waited at the driver's wheel outside to help him get away. That's an example of what might be sufficient in a particular case.

"If a defendant intentionally stood outside the store as a lookout *for the purpose of helping commit an armed robbery* in a store, knowing that his friend was committing a robbery inside with a gun, that might be sufficient in a particular case.

"Another example of assistance, if a defendant helped a confederate, knowing that he was armed, to restrain or to intimidate a victim *for the purpose of accomplishing an armed robbery.*

"Another example is if a defendant, by agreement with another man, knowing that he was armed, intentionally placed himself in a position to give him immediate assistance, if needed, *for the purpose of accomplishing an armed robbery, and thereby helped accomplish an armed robbery by encouraging the other man to commit it.*

"Those are examples to assist you in understanding what I mean by assistance, or what the law means by assistance." (Emphasis added.)

[15]Rule 16 (1) of the Massachusetts Rules of Appellate Procedure, as amended, 386 Mass. 1247 (1982), provides:

"When pertinent and significant authorities come to the attention of a party after his brief has been filed, or after oral argument but before decision, a party may promptly advise the clerk of the court, by letter,

exercise our power to order a new trial or to reduce the verdicts.

*Judgments affirmed.*

---

with a copy to all counsel, setting forth the citations. There shall be a reference either to the page of the brief or to a point argued orally to which the citations pertain, but the letter shall *without argument* state the reasons for the supplemental citations. Any response shall be made promptly and shall be similarly limited." (Emphasis added.)

The rule "does not authorize reargument in the disguise of a supplementary citation." Reporters' Notes to Mass. R. A. P. 16 (l), Mass. Ann. Laws, Rules of Appellate Procedure, at 83 (Lexis 1997).